UNITED STATES OF AMERICA
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

ERIN EUNAH KIM

CASE NO. 6:24-cr-170-JSS-DCI
21 U.S.C. § 846
21 U.S.C. § 841

## INDICTMENT

The Grand Jury charges:

### A.   Introduction

At times material to this Indictment:

### The Controlled Substances Act

1. The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801 et seq., and its implementing regulations governed the manufacture, distribution, and dispensation of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological

1

dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to Schedule II had a high potential for abuse, was highly addictive, and had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could have led to severe psychological and/or physical dependence.

4. Pursuant to the CSA and its implementing regulations, amphetamine-dextroamphetamine was classified as a Schedule II controlled substance. Amphetamine-dextroamphetamine was sold generically and under a variety of brand names, including Adderall. Other stimulants, including lisdexamfetamine (sometimes sold under the brand name Vyvanse) and methylphenidate (sometimes sold under the brand name Ritalin), were classified as Schedule II controlled substances.

5. Medical practitioners, such as nurse practitioners and physicians, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b); 21 C.F.R. § 1306.03. Medical practitioners were required to register with the Drug Enforcement Administration ("DEA") in order to prescribe controlled substances. The registration of mid-level practitioners, such as nurse practitioners, was contingent upon the authority granted

by the state in which they were licensed. Upon application by the practitioner, the DEA assigned a unique registration number to each qualifying medical practitioner. The DEA was responsible for enforcement of controlled substance laws in the United States.

6.   The CSA required all practitioners to be registered in the state in which the patients to which they were prescribing controlled substances were located, regardless of whether the prescribing was taking place via telemedicine. The CSA provided that every person who dispensed, or who proposed to dispense, any controlled substance was required to obtain from DEA a registration issued in accordance with DEA rules and regulations. 21 U.S.C. § 822(a)(2). Under the CSA, such dispensing included prescribing and administering controlled substances. *Id.* § 802(10). DEA was permitted to only register a person to dispense a controlled substance if that person was permitted to do so by the jurisdiction in which his or her patients were located. *Id.* §§ 802(21), 823(f). Thus, unless an applicable exception applied, DEA regulations required a practitioner to obtain a separate DEA registration in each state in which a patient to whom he or she prescribed a controlled substance was located when the prescription was made, regardless of whether the prescription was made via telemedicine.

7.   Title 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions for controlled substances; it provided that, to be effective, a prescription for a controlled substance:

3

must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

8. In addition, Title 21 of the Code of Federal Regulations, Section 1306.03 requires that valid prescriptions for controlled substances must be issued by an "individual practitioner" who is "[a]uthorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession . . . ."

### State Laws Regarding Schedule II Prescriptions by Nurse Practitioners

9. Regarding the prescribing of controlled substances, certain states set forth regulations governing the supervision of nurse practitioners by physicians. These regulations generally provided that nurse practitioners were required to enter into an agreement with a collaborating or supervisory physician in order to lawfully prescribe controlled substances, including Adderall and other stimulants. These regulations also established that a collaborating or supervisory physician was responsible for supervising the nurse practitioner and complying with the applicable standard of care. On a periodic basis, the collaborating or supervisory physician was

4

required to consult with the nurse practitioner and make a personal review of the prescription practices for each patient, including a review of medical files.

10.     In Texas, a nurse practitioner could only prescribe a Schedule II controlled substance to patients in limited circumstances, including in hospital settings or as part of the treatment of a person with a terminal illness who is receiving hospice care. A properly licensed physician in a collaborating relationship with a nurse practitioner could issue prescriptions recommended by nurse practitioner for patients in Texas that were diagnosed and treated by the nurse practitioner where: a) the nurse practitioner had established a practitioner-patient relationship; b) the physician had sufficient information to independently evaluate whether the prescription was for a legitimate medical purpose; and c) the physician documented such independent evaluation for each prescription or dosage change.

## The Ryan Haight Act

11.     The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 was enacted to stem the increase in the use of controlled substances purchased on the Internet. The Act mandated, with limited exceptions, that the dispensing of a controlled substance by means of the Internet be predicated on a valid prescription issued by a practitioner who has conducted at least one in-person medical evaluation of the patient. The Act was codified in Title 21 of the United States Code.

12.     Title 21, United States Code, Section 841(h) provided that it was unlawful to "knowingly or intentionally— writ[e] a prescription for a controlled

substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of [Title 21, United States Code,] [S]ection 829(e) . . . ."

13. Title 21, United States Code, Section 829(e)(1) provided that, "[n]o controlled substance that is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

14. Title 21, United States Code, Section 829(e)(2)(A) provided that in order for a prescription to be valid it had to be "issued for a legitimate medical purpose in the usual course of practice by— (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner.

15. Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" was "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

16. Title 21, United States Code, Sections 829(e)(3) and 802(54) provided that the requirement of conducting at least one in-person medical evaluation did not apply in certain circumstances involving "the practice of telemedicine" where the Secretary of Health and Human Services ("HHS") has declared "a public health emergency" and it "involve[d] patients located in such areas, and such controlled substances, as the Secretary [of HHS], with the concurrence of the Attorney General, designate[d]...." 21 U.S.C. § 802(54)(D).

6

17. Title 21, United States Code, Section 802(54) provided that "[t]he term 'practice of telemedicine' means, for purposes of this subchapter, the practice of medicine in accordance with applicable Federal and State laws by a practitioner (other than a pharmacist) who is at a location remote from the patient and is communicating with the patient, or health care professional who is treating the patient, using a telecommunications system referred to in [S]ection 1395m(m) of [T]itle 42 . . . ."

18. Title 42, United States Code, Section 1395m(m)(1) and implementing regulations, including Title 42, Code of Federal Regulations, Section 410.78, provided that a telecommunications system meant "multimedia communications equipment that includes, at a minimum, audio and video equipment permitting two-way, real-time interactive communication between the patient and distant site physician or practitioner," and "include[d] store-and-forward technologies that provide for asynchronous transmission of health care information" only in "telemedicine demonstration program conducted in Alaska and Hawaii."

19. On or about January 31, 2020, the Secretary of HHS declared a national public emergency under Title 42, United States Code, Section 247d as a result of the spread of the novel coronavirus COVID-19 within the United States.

20. In response to the COVID-19 Public Health Emergency as declared by the Secretary, pursuant to the authority under Section 319 of the Public Health Service Act (42 U.S.C. § 247), the DEA granted temporary exceptions to the Ryan Haight Act and DEA's implementing regulations under Title 21, United States Code,

7

Section 802(54)(D), thereby allowing the prescribing of controlled medications via telemedicine encounters—even when the prescribing practitioner had not conducted an in-person medical evaluation of the patient—in certain circumstances in order to prevent lapses in care.

21. These emergency flexibilities to limit the spread of COVID-19 allowed, during the pendency of the COVID-19 Public Health Emergency, the prescribing of controlled substances without first conducting an in-person examination only if all of the following conditions were met: the prescription was issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice; telemedicine communication was conducted using an audio-visual, real-time, two-way interactive communication system; and the practitioner was acting in accordance with applicable federal and state laws.

### The Defendant and Relevant Entities and Individuals

22. Okay Health, Inc., was a Delaware corporation that was incorporated on or about February 26, 2020, and did business as "Okay Health" and "Done." In or around April 2021, the company was renamed Done Global, Inc. (collectively, with its predecessor name Okay Health, Inc., referred to herein as "Done Global").

23. Done Health, P.C., was a California corporation that was incorporated on or about August 7, 2020 (together with its affiliated company, Done Global, referred to herein as "Done"). Done was a self-proclaimed "digital health company" that operated on a subscription-based model where individuals ("Done Members") paid a monthly fee to Done. Done advertised that it provided online diagnosis,

8

treatment, and refills of medication for attention deficit hyperactivity disorder ("ADHD"). Done's principal place of business was within the Northern District of California.

24. Done maintained a network of medical professionals ("Done Prescribers") that included doctors and nurse practitioners who Done paid to diagnose Done members with ADHD and to write prescriptions for controlled substances, including Adderall and other stimulants.

25. Defendant ERIN EUNAH KIM was a psychiatric mental health nurse practitioner licensed in multiple states, including Florida, Kentucky, and Texas. KIM maintained a DEA registration number and was authorized to prescribe Schedule II controlled substances in some states, including Florida. KIM was a Done Prescriber from January 2021, to present, and received approximately in excess of $821,350 in exchange for prescribing approximately 1.5 million pills of Adderall and other stimulants to Done members.

26. Practitioner 1 was a physician licensed in Texas. Practitioner 1 maintained multiple DEA registration numbers and was authorized to prescribe Schedule II controlled substances in Texas. Practitioner 1 was the collaborating physician for KIM in the State of Texas. Practitioner 1 was also a Done Prescriber.

## COUNT ONE
## (Conspiracy to Distribute Controlled Substances)

### A.   Introduction

27.   The allegations contained in Paragraphs 1 to 26 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### B.   Conspiracy

28.   From in or around January 2021, and continuing through in or around January 2023, in the Middle District of Florida, and elsewhere, the defendant,

ERIN EUNAH KIM,

did knowingly and intentionally combine, conspire, confederate, and agree with Practitioner 1, and with other persons known and unknown to the Grand Jury, to knowingly and intentionally distribute and dispense mixtures and substances containing a detectable amount of controlled substances, including amphetamine-dextroamphetamine and other stimulants, Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice, in violation of Title 21, United States Code, Section 841.

### C.   Purpose of the Conspiracy

29.   It was the purpose of the conspiracy for KIM, Practitioner 1, and others to unlawfully enrich themselves by: (a) providing Done Members with prescriptions for Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice; (b) enabling Done Members to obtain Adderall and other stimulants from pharmacies; (c) concealing and disguising the

10

unlawful prescription of Adderall and other stimulants; and (d) diverting proceeds of the conspiracy for their personal use and benefit, for the use and benefit of others, and to further the scheme.

### D. Manner and Means of the Conspiracy

30. The manner and means by which KIM and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

    a. It was part of the conspiracy that Done acquired thousands of Done Members by, among other things, spending tens of millions of dollars on deceptive social media advertisements, including intentionally targeting drug-seeking patients, and advertising that members could obtain easy access to prescriptions for Adderall and other stimulants in exchange for payment of a monthly subscription fee to Done.

    b. It was further part of the conspiracy that KIM and others agreed with Done to work as independent contractors for Done and were paid to diagnose Done members with ADHD and issue prescriptions for Adderall and other stimulants regardless of whether the prescriptions were for a legitimate medical purpose in the usual course of professional practice, in order to increase subscription revenue for Done and its co-conspirators, and payments to KIM.

    c. It was further part of the conspiracy that KIM obtained confidential patient information for thousands of Done members in order for KIM to write prescriptions for Adderall and other stimulants.

11

   d. It was further part of the conspiracy that KIM ordered Adderall and other stimulants for Done members with whom she lacked a pre-existing practitioner-patient relationship, without an examination, and sometimes based solely on a short video or audio communication and limited patient intake documents, or without any video or audio communication at all.  KIM agreed with others at Done to provide few, if any, medical treatment options besides prescribing Adderall and other stimulants.

   e. It was further part of the conspiracy that, in the course and scope of her work for Done, and for the benefit of herself and Done, KIM signed orders for Adderall and other stimulants for Done members in cases where the Done member (a) did not meet the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) criteria for diagnosing ADHD; (b) posed a risk of diversion; and/or (c) was provided dosages, directions, combinations, or quantities of medications beyond those normally prescribed.

   f. It was further part of the conspiracy that, after an initial consultation with a Done member, KIM signed additional monthly prescriptions for Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice (a) without an in-person examination or audio/visual communication with Done members, and (b) without determining the Done members' medical need for the prescriptions.  In some instances, Done paid KIM and others to write prescriptions for Done members with whom KIM had never seen or had any prior telemedicine consultation.

g.  It was further part of the conspiracy, and in order to maximize profits, that KIM did not always provide follow-up medical care for Done members after an initial consultation. KIM received payment solely based on "patient load" (the number of patients to whom KIM wrote prescriptions each month), and, in order to maximize her profits, did not provide patient consultation, time, or medical services after an initial consultation. Instead, KIM wrote prescriptions for Adderall and other stimulants based on auto-generated requests for prescriptions for Done members, including ordering Adderall and other stimulants for Done members after they had died.

h.  It was further part of the conspiracy that KIM and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of patient files, prescriptions, pre-authorizations, and other records, all to support prescriptions that were not for a legitimate medical purpose in the usual course of professional practice.

All in violation of 21 U.S.C. § 846.

### COUNTS TWO AND THREE
### (Distribution of Controlled Substances)

31.  The allegations contained in Paragraphs 1 through 26 and 29 through 30 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

32.  On or about each of the dates set forth below, in the Middle District of Florida, and elsewhere, the defendant,

13

ERIN EUNAH KIM,

did knowingly and intentionally distribute and dispense, and aid or abet in the distribution or dispensing of, mixtures and substances containing a detectable amount of the listed Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice:

| Count | Done Member | Approx. Date of Prescription | Controlled Substance |
|---|---|---|---|
| Two | A.R. | June 12, 2022 | Adderall IR 30 mg tablets 2x per day |
| Three | A.R. | July 8, 2022 | Adderall IR 30 mg tablets 2x per day |

Each in violation of 21 U.S.C. § 841(a) and (b)(1)(C) and 18 U.S.C. § 2.

## FORFEITURE

1.  The allegations contained in Counts One through Three are incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 21 U.S.C. § 853.

2.  Upon conviction of a violation of 21 U.S.C. §§ 841(a)(1) and/or 846, the defendant shall forfeit to the United States, pursuant to 21 U.S.C. §§ 853(a)(1) and (2), any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as a result of such violation, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

3. If any of the property described above, as a result of any acts or omissions of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property, which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

A TRUE BILL,

███████████
FOREPERSON

ROGER B. HANDBERG
United States Attorney

GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

By: *[signature]*
RAYMOND E. BECKERING III
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice

FORM OBD-34
June 24

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Orlando Division

## THE UNITED STATES OF AMERICA

vs.

## ERIN EUNAH KIM

## INDICTMENT

Violations: 21 U.S.C. § 846
21 U.S.C. § 841

A true bill

_____
Foreperson

Filed in open court this 25th day

of June, 2024

_H. _____
Clerk

Bail $_____

GPO 863 525